AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
06/04/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: _____IGU_____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

FILED
June 4, 2024
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY: _Nancy Boehme_
Deputy Clerk, U.S. District Court

United States of America

v.

WING YI CHAN

   Defendants.

Case No.   2:24-mj-03244-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 30, 2024, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Methamphetamine |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Henry Blackwell, Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: June 4, 2024

Judge's signature

City and state: Santa Ana, California

Hon. Douglas F. McCormick, U.S. Magistrate Judge
Printed name and title

AUSA J. Waier
x3550

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Henry Blackwell, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against WING YI CHAN ("CHAN") for Possession with Intent to Distribute Methamphetamine, in violation of Title 21, United States Code, Section § 841(a)(1).

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, a review of law enforcement databases, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND FOR SPECIAL AGENT HENRY BLACKWELL

3. I am a Special Agent ("SA") with the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been so employed since April 2017. I am currently assigned to a taskforce under the Transnational Criminal Organizations division ("TCO") called Strike Force, located in Los Angeles, California. The Taskforce is responsible for

investigating drug trafficking violations some of which involve mail parcels, including those sent internationally.

4. Prior to being assigned to Strike Force, I was assigned to the HSI Office of the Assistant Special Agent in Charge in El Segundo, California, as part of the Los Angeles International Airport ("LAX") Border Enforcement Security Taskforce, which is responsible for investigating drug trafficking violations involving international mail. Before my current employment with HSI, I served as a U.S. Customs and Border Protection Officer ("CBPO") from November 2014 until April 2017 at LAX. Prior to becoming a CBPO, I worked for U.S. Border Patrol ("BP") from August 2013 to November 2014.

5. I graduated from the Criminal Investigator Training Program, at the Federal Law Enforcement Training Center in December of 2017. I also completed the CBPO Academy in April 2015, as well as the BP Academy in February 2014; both are located at the Federal Law Enforcement Training Center. Through my training, I have learned of HSI's criminal investigative authority, as well as investigative techniques. HSI is responsible for enforcing federal criminal statutes prohibiting, among other things, the distribution of and possession with intent to distribute drugs, in violation of Title 21 of the United States Code and money laundering. During my employment with HSI, I have investigated the smuggling of drugs throughout the United States as well as money laundering violations. I have executed search warrants to seize evidence of violations of federal and state law, as well as effected arrest warrants to

apprehend individuals who have committed such violations. I am familiar with how drug traffickers, exporters, money launders, and smugglers, use digital devices and the U.S. mail system to facilitate and conceal their crimes.

### III. PROBABLE CAUSE

6. On May 30, 2024, U.S. Customs and Border Protection ("CBP") intercepted two drug mules, Pei Ling LIN ("P.LIN") and Qi Feng LIN ("Q.LIN") at the Los Angeles International Airport ("LAX"). P.LIN and Q.LIN were attempting to export 12 wine bottles containing liquid methamphetamine[1] from the United States to Japan. From reviewing reports, I learned the following:

    a. On May 30, 2024, CBP conducted an outbound border search of P.LIN and Q.LIN's check luggage at LAX, resulting in the seizure of 12 bottles of liquid methamphetamine,[2] based on presumptive testing.

    b. An examination of law enforcement databases showed that P.LIN and Q.LIN put the Del Aire Inn, located at 4610 West Imperial Hwy, Inglewood, CA 90304 ("the Del Aire Inn"), as the hotel they were staying at while in the United States.

---

[1] The liquid field tested presumptive positive for methamphetamine and will be sent to the CBP laboratory for analysis.

[2] P.LIN and Q.LIN claimed to be brother and sister. Six of the bottles filled with liquid methamphetamine (weighing approximately 13.64 kilograms) were found in P.LIN's checked luggage. Six bottles filled with liquid methamphetamine (weighing approximately 13.72 kilograms) were found in Q.LIN's checked luggage. The liquid methamphetamine was weighed when it was still in the wine bottles.

   c. HSI SAs Andrew Cox and Daniel Dang conducted a <u>Mirandized</u> interview of P.LIN. P.LIN stated that two other individuals, Pei Jun DAI ("DAI") and Jhih Yu LI ("LI"), were traveling with P.LIN and Q.LIN. P.LIN also stated DAI and LI were still at the Del Aire Inn in Room 217, and were in possession of additional bottles containing liquid methamphetamine.

   d. An examination of law enforcement databases showed DAI and LI were both scheduled to depart the United States to Japan on May 31, 2024, aboard United Airlines Flight 39. Also, DAI and LI both put the Del Aire Inn as the hotel they were staying at while in the United States.

  7. On May 30, 2024, the Honorable Margaret M. Bernal signed a state search warrant authorizing the search of Room 217 at the Del Aire Inn. Later that same day, agents from HSI, the Drug Enforcement Administration ("DEA"), and Federal Bureau of Investigation ("FBI") executed the search warrant and searched Room 217 at the Del Aire Inn. From my presence at the search warrant, a review of reports, and talking with other agents, I learned the following:

   a. DEA TFO Trent Chandler and DEA SA Zachary Bargeron located 12 bottles of suspected liquid methamphetamine concealed within two suitcases (6 bottles in each suitcase), pictured below. One of the suitcases contained a baggage tag for DAI.

 

b. SA Cox and I conducted a Mirandized interview with DAI and LI. Both DAI and LI stated they were planning to smuggle the liquid methamphetamine to Japan and, on May 29, 2024, picked up the bottles containing liquid methamphetamine from an Asian female who lived at the Atelier Apartments, located at 801 S. Olive Street, Los Angeles, California 90014.

8. On May 31, 2024, I, along with other agents, went to the Atelier Apartments and reviewed surveillance video that was recorded on May 29, 2024. A review of the surveillance video showed DAI and LI enter the Atelier Apartments with an Asian female, later identified as CHAN. DAI and LI had a large suitcase and went with CHAN into the apartment elevator and exited the 24th floor. A short time later, DAI, LI, and CHAN

5

returned to the elevator on the 24th floor with the large suitcase and departed.

9.   As I was reviewing the surveillance video, I observed CHAN walk through the apartment lobby towards the exit. SA Sugiyama, SA McMahon, and I approached CHAN and asked to speak with her.  While I was trying to obtain CHAN's biographical information, CHAN asked what this was about and said she wanted to call her lawyer.  I advised CHAN that she was not under arrest, but I was conducting a criminal investigation and she was being detained and was not free to leave.  At that time, CHAN made the spontaneous utterance that someone had dropped off a box to her; she became suspicious; and so, she opened it and saw a white powder like substance.  CHAN repeated her story after SA Sugiyama and I obtained a digital recording device.

10.   I then advised CHAN of her <u>Miranda</u> rights from a pre-printed <u>Miranda</u> card.  CHAN said she understood her rights and was willing to speak with agents without a lawyer present.  The interview was conducted in the apartment complex office and later inside CHAN's apartment.  CHAN stated the following:

   a.   CHAN had been living in apartment number 2414 for the past two months and paid $3,400 each month.

   b.   On May 30, 2024, a friend in Hong Kong known to her only as "Dragon" asked CHAN to host two Taiwanese friends who were visiting Los Angeles.  On the same date, an Asian female and male came to her apartment with a suitcase.  The couple removed a cardboard box from the suitcase and asked CHAN

6

to hold the box for them for a few days.  CHAN agreed and a short time later the couple left.

      c.    CHAN became suspicious and opened the box and observed a white powder like substance that she suspected was drugs.  CHAN showed SA Sugiyama and I a photograph from her phone of the white powder like substance.  From my training, knowledge, and experience, the white powder like substance appeared to be crystal methamphetamine.  CHAN called "Dragon," who asked her to weigh the white powder like substance, which she did, and it weighed approximately three kilograms.

      d.    CHAN met "Dragon" online, and "Dragon" said he would pay for her to travel and stay in the United States.  After her stay in the United States, CHAN was supposed to report to "Dragon" about her experience.  "Dragon" paid for CHAN to obtain a Visa and paid for her flight to the United States.

      e.    After approximately 3-5 weeks, "Dragon" began directing CHAN to receive and deliver packages on his behalf.  CHAN initially did not know what the packages contained, but knew it was not good and was possibly marijuana.

      f.    CHAN later stated she was paid approximately $4,000 per month to pick-up, package, and deliver what she believed to be liquid methamphetamine.

      g.    A few days prior, CHAN picked up 22 bottles of liquid methamphetamine from a Chinese male in Eastvale, CA and was paid $100 per bottle to retrieve the bottles and bring them to the apartment.  "Dragon" wanted to eventually cut out the middle man and via a video call directed CHAN on how to convert

crystal methamphetamine into liquid and conceal it within wine bottles.

        h.    CHAN combined one kilogram of crystal methamphetamine with 500 milliliters (mL) of water and heated it on the stove to create liquid methamphetamine that would fill a 1.5 liter wine bottle.  CHAN filled two wine bottles for practice.  CHAN later gave all 24 bottles of liquid methamphetamine to the Taiwanese couple.  CHAN said the box containing approximately three kilograms of crystal methamphetamine was actually delivered to her by an unidentified white male a few days prior.

        i.    CHAN said agents could remove the white powder like substance from her apartment and agreed to take agents up to her apartment to retrieve it.  CHAN escorted SA Sugiyama, SA McMahon, and me to her apartment and showed me the open box containing approximately 3,071 grams of suspected crystal methamphetamine.  On a nearby bookshelf in plain view, I also observed a white plastic bag containing approximately 609 grams of a crystal substance, which later tested presumptively positive for methamphetamine.  The substances are pictured below.


 

11. SA Sugiyama asked CHAN for consent to search her apartment. CHAN agreed and signed a written consent to search form.

12. SA Sugiyama subsequently asked CHAN for consent to search her iPhone. CHAN agreed and signed a written consent to search form. I conducted a cursory search of CHAN's iPhone and observed a conversation between CHAN and an unknown person, detailing the purchase, concealment, and distribution, of what appeared to be methamphetamine and other drugs.

13. The following are just a few of the pictures on CHAN's cellphone that I found in a chat conversation between CHAN and the unknown individual.







## IV. CONCLUSION

14. For all of the reasons described above, there is probable cause to believe that WING YI CHAN has committed a violation of Title 21, United States Code, Sections § 841(a)(1), namely, Possession with Intent to Distribute Methamphetamine.

Attested to by the applicant
via telephone in accordance
with the requirements of Fed.
R. Crim. P. 4.1 on this date,
June  4 , 2024.

_____
DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE